# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 9, 2013

## STATE OF TENNESSEE v. CASEY COLBERT

**Appeal from the Criminal Court for Shelby County**
**Nos. 09-07785, 11-05332    James Lammey, Judge**

_____

**No. W2012-00099-CCA-MR3-CD  - Filed June 18, 2013**

_____

Casey Colbert ("the Defendant") was convicted by a jury of first degree felony murder; attempted aggravated robbery; employing a firearm during the commission of a dangerous felony; two counts of bribing a witness; and two counts of coercing a witness. The trial court sentenced the Defendant to life imprisonment for the murder conviction. After a hearing, the trial court merged the two convictions for coercing a witness into a single conviction and sentenced the Defendant to six years for the attempted aggravated robbery conviction; six years for the firearm conviction; six years for each of the bribery convictions; and four years for the coercion conviction. The trial court ordered partial consecutive service for an effective sentence of life plus twenty-two years, all to be served in the Tennessee Department of Correction. In this direct appeal, the Defendant contends that (1) the evidence is not sufficient to support his murder conviction; (2) the trial court erred in consolidating the offenses against the witness with the other offenses; (3) the prosecutor engaged in improper argument; (4) cumulative errors entitle him to a new trial; and (5) his sentence is excessive. Upon our thorough review of the record and the applicable law, we hold that the trial court committed error in consolidating the indictments. As to the Defendant's convictions of first degree murder and attempted aggravated robbery, we hold that the trial court's error was harmless. As to the Defendant's convictions for bribing and coercing a witness, we hold that the error was not harmless. Accordingly, we reverse the Defendant's convictions of bribing and coercing a witness and remand those charges for further proceedings. Because the Defendant did not employ a firearm during the commission of a "dangerous felony," as that term is defined by statute, we reverse the Defendant's conviction of that offense. We affirm the Defendant's convictions of first degree felony murder and attempted aggravated robbery, and we remand this matter for a new sentencing hearing on those offenses.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed in Part,**
**Reversed in Part; Remanded**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Paul K. Guibao (on appeal), and Arthur Horne and Murray Wells (at trial), Memphis, Tennessee, for the appellant, Casey Colbert.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy Weirich, District Attorney General; and Stacy McEndree and Kevin Rardin, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

In December 2009, the Defendant and William Peete jointly were indicted for one count of first degree felony murder committed during the perpetration of an attempted robbery; one count of attempted aggravated robbery; and one count of employing a firearm during the commission of a dangerous felony. In August 2011, the Defendant was indicted for two counts of bribing a witness and two counts of coercing a witness. After a hearing and over the Defendant's objection, the trial court consolidated the offenses alleged in the two indictments for a single trial. At the ensuing jury trial,[1] the following proof was adduced:

Homicide victim Ben Walker's mother, Beverly Walker ("Mother"), testified that her son was born on September 13, 1986. He was a high school graduate and owned his own tree business. He frequently was paid in cash for the work he performed on customers' trees. Mother last saw her son alive on the evening of May 7, 2009. On that night, the victim was driving a rented pickup truck because his vehicle was in the shop. At approximately 10:20 p.m. that night, Mother got a phone call advising her that the victim had been shot. She and her husband drove to The Med, where they were advised that the trauma surgeon had not been able to save the victim's life. The victim was twenty-two years old.

Charles Smith, twenty years old at the time of trial, testified that he grew up in Texas but came to the Memphis area in January 2009 to be with his cousin. They lived together near the Pruetts. He met the Pruetts and Peete, and they all became friends. He also met the victim, Ben Walker. The victim gave him a job doing tree service, for which the victim paid him in cash. He had known the victim for two or three months at the time the victim was killed.

---

[1] Only the Defendant was on trial in this case.

2

On May 7, 2009, Smith had been hanging out at the Pruetts' house off and on all day. That evening, he sat with Peete in Peete's car while Peete smoked some marijuana. Peete's car was parked near the Pruetts' house. As Smith was leaving Peete's car, the Defendant walked over and told Smith that he was going to rob "Ben" because "Ben" had three or four thousand dollars on him. Smith knew the Defendant from having seen him around the Pruetts' house a couple of times. Smith clarified that the Defendant said he was going to "pop" "Ben," which Smith understood to mean both rob and kill. Smith testified that he did not know which "Ben" the Defendant was referring to because there were three in the neighborhood.

After this conversation, the Defendant got in the car with Peete, and the two men drove away. They returned in about fifteen minutes. At this point in time, it was dark. Peete and the Defendant remained in the car. Smith was getting ready to leave. He told Peete, who was still sitting in the car with the Defendant, that he would be back in a little while. As Smith was leaving, he saw the victim pull up alongside the street. Smith saw two or three people in the victim's truck. He also saw Peete walk up to the victim's truck. Smith went to his cousin's house, a short distance away.

About fifteen minutes later, Smith heard a gunshot. He testified, "I ran back down there and I seen Ben running around the curve and laid down on the curve beside the trash cans with a bullet hole in his chest." The time was approximately 10:00 or 10:15 p.m. Smith testified that Peete was still there, but he did not see the Defendant at the scene.

Smith spoke with the police later that night but was unable to identify a photograph of the Defendant in a photographic array. He stated that the Defendant at trial looked "way different" than he did at the time of the crime.

Smith acknowledged that he had been convicted in Texas of two counts of burglary. He also had been convicted of a misdemeanor theft.

On cross-examination, Smith stated that he did not smoke marijuana with Peete in Peete's car on the evening of May 7, 2009. He also stated that he had seen the Defendant "[j]ust a few times" prior to the shooting. He did not see the Defendant shoot the victim.

Dana Pruett, twenty-one years old at the time of trial, testified that, in May 2009, she was living at 3585 Terrace Drive in Memphis, Shelby County, Tennessee. The property consisted of a house and "a mother-in-law house in the back connected to the garage" ("the back house"). She lived in the main house with her parents, her daughter, her sister Stacy, and Stacy's boyfriend, William Peete. Living in the back house were one of her other sisters,

3

her sister's husband, and their four children. She was acquainted with the Defendant because he spent a lot of time at the back house.

Pruett's boyfriend was Joshua Russell. Russell and the Defendant were friends. Pruett knew that the Defendant had a silver and black handgun because she kept the gun in a drawer in her room to keep it away from the children. She testified that she had seen the Defendant with this gun.

Pruett testified that she did not see the Defendant on May 7, 2009. That night, about 10:30 p.m., she heard a gunshot. Russell came in yelling that the victim had been shot. She ran outside and saw the victim lying on the concrete. She added that she could tell he had been shot because there was "blood everywhere." The victim was still alive, and she and her sister began giving him CPR. She stated it was forty-five minutes before the ambulance arrived. She did not see the Defendant at the scene. She never saw the Defendant's handgun again.

On cross-examination, Pruett stated that she recalled Smith arriving at the scene after the police arrived, approximately ten minutes after the shooting.

Shelby Thompson, eighteen years old at the time of trial, stated that the victim had been her boyfriend for "a couple days" at the time he was killed. They had been friends for several years prior to becoming romantically involved. She knew Peete because he lived near her mother's house. She also knew the Pruetts, and she had met the Defendant.

On May 7, 2009, the victim picked Thompson up at her mother's house. They went to the victim's mother's house and spent some time there. They returned to Thompson's neighborhood. A little before 10:30 p.m., they went to the Shell gas station on Highway 51, around the corner from her mother's house. With them was Nick Parker, a friend. They left the gas station and pulled up at the end of Floyd Street, the street on which Thompson lived. Floyd Street intersected with Terrace. When they pulled up in front of the Pruetts' house, Peete got out of his car. She testified,

> [Peete] walked up to the driver's side of the truck. And the only thing
> I remember is I heard feet and somebody came up to the window and put the
> gun in the window and told Ben to give him all his money and shot.

She stated that the only thing she could remember about the shooter was his eyes. She testified that the shooter was "wild-eyed. Like, almost like he was scared too." She added that the shooter was wearing a red bandana over his face.

4

Thompson testified that the victim got out of the truck and ran off. The shooter ran after him. She got out of the truck and asked Peete what to do. Peete did not respond but jumped a fence. She followed him. She and Peete then approached the victim, who was lying on the ground. She did not walk up to the victim but began calling the police. She stated that she was scared.

On cross-examination, Thompson stated that, when Peete came up to the victim's truck, he handed the victim a "blunt," a marijuana cigar. She did not know if it was lit. They were parked on the street under a street light.

Joshua Russell testified that, in May 2009, he was living in a house at the corner of Terrace and Floyd with his girlfriend and her family. He clarified that his girlfriend was Dana Pruett. Peete also was living with them. He had known Peete for several years. He knew the Defendant from the neighborhood and also because he had bought a dog from the Defendant. He also was acquainted with the victim.

On the night of May 7, 2009, between 10:00 and 10:30 p.m., Russell and Pruett were putting her baby to bed. He stated that Pruett fell asleep, and he went to get something to eat. He heard a gunshot and went outside to investigate. He testified, "I seen [sic] a black male about two steps from the woods and then I seen [sic] Ben on the ground with the garbage can had flipped over on top of him." He did not realize that the victim had been shot. He walked down to the victim and took the garbage can off of him. He reached down to pick the victim up and heard the victim say, "fuck." Russell realized that the victim was "bleeding really bad" and ran back to the house and told "them" to call 911. He and Pruett returned to the victim and began CPR. Russell stated that, "[w]here [he] was putting [his] hands to do the CPR, that's where the hole was and [he] was trying to keep pressure."

Russell testified that he had last seen the Defendant about an hour to an hour and a half prior to laying the baby down. He did not see the Defendant after he heard the gunshot. He did not see him ever again at the house. Prior to the shooting, the Defendant had told Russell that he "need[ed] a lick." Russell explained that "a lick" was "[a]n easy way to come across money," for example, coming across a car with the keys in it. Russell also testified that, prior to the shooting, he had seen the Defendant with a 40-caliber semiautomatic pistol with silver on it. He had seen the Defendant with this gun on May 7, 2009.

5

After the victim was shot, the Defendant called Russell on Russell's cell phone. Russell testified about the phone call:

> He said what are you doing. I said I'm in the back of the cop car, I think you know why. He said I've been in the club for the last two hours. I can't hear you, I'm going to call you back when I go outside the club.

Russell added that, although he heard loud music in the background of this phone call, he did not hear any people talking or any club sounds. Russell stated that, after this conversation, the police "snatched" his phone. He did not have any more conversations with the Defendant.

On cross-examination, Russell stated that the victim had been "flashing large sums of money" by "driving around talking about how much money he had and holding it out like this out the window." He added, "And where we live you don't do that."

Nicholas Parker, twenty-three years old at the time of trial, testified that, at the time in question, he lived at 820 Floyd, "at the opposite end of the street where the incident happened." He had known the victim for five or six years and occasionally worked for him. On May 7, 2009, he and the victim were visiting Casey Sears at Sears' house on the same street. Parker drank some beer and smoked some marijuana. He testified that he did not have enough to "mess [him] up." He also saw Thompson there. Around 10:00 p.m., he left Sears' house with the victim and Thompson. The victim was driving a truck. Thompson sat next to the victim and Parker sat in the passenger seat. They went to a Shell station on the corner of 51 and Frayser Boulevard. The victim got out of the truck and came back with beers for himself and Parker. Parker and Thompson waited in the truck. After the victim returned, a "heavy set, bald black guy" came up to the driver's door and told the victim to come by the house, "that he'd smoke a blunt with him." Parker did not know who this man was. The victim agreed to come by.

They left and drove around a couple of blocks and then "pulled up at the guy's house." Parker had not been there before. Shortly after they parked, "the guy that was at the store walked out and walked around to the driver's door and pulled the blunt out and lit it." The man "hit it a couple of times" and then passed the "blunt" to the victim. Parker testified: "Next thing I remember is hearing some footsteps and a guy ran up to the driver's door, pointed a gun in Ben's face and said give me your fucking money." When asked to describe the assailant, Parker stated, "I could see a red bandana up to his nose and something black over the top of his head where just like the eyes where you can see and that's all I can remember." Parker stated that the gun was a semiautomatic and "a larger caliber."

6

Parker testified that, after he was accosted, the victim "was in shock and he turned and looked over toward [Parker] and had a shocked look on his face, mouth was wide open." According to Parker, the victim then looked "back toward the guy with the pistol. And soon as he turns his head back, the guy hit him with the pistol." Parker clarified that the man hit the victim in the face with the pistol. The man said, "I'm not fucking playing." Parker added, "right almost immediately after he was hit in the face, when the gun dropped down toward his chest the guy pulled the trigger." After being shot, the victim "jumped up and knocked the guy out of the way and took off running." Parker got out of the truck, dropped to the ground, and rolled under the truck. Thompson got out of the truck and ran. Parker stated that, from his vantage point, he saw the assailant run after the victim.

Parker rolled out from under the truck and ran to the edge of the wood line and "crouched down beside a tree." Parker testified that he was scared. While he was beside the tree, he saw the assailant "run into the woods." Parker stated that they were about fifteen feet apart. The assailant saw him and pointed his gun at Parker. The man told Parker "to get [his] ass back over there." The man then ran through the woods toward the train tracks. Parker ran back toward the victim's truck.

Parker went to where the victim was lying on the ground and turned him over. He saw that the victim had been hit in the chest.

Parker added that, during the assault, he did not see the victim fight back or ever reach for the gun. He also stated that the victim usually carried cash in his wallet, which he kept in a back pocket.

Heather Emery testified that, at the time in question, she was living with her children and husband in the back house. A night or two before May 7, 2009, the Defendant spent the night in the back house. She had just met the Defendant at that point. She stated that the Defendant had a tattoo of his name on one side of his neck. During the three-day period before the shooting, the Defendant was at the back house most of the time. On the first or second day of that period, the Defendant showed her a gun. She did not know what type of gun it was.

On May 7, 2009, Peete was there most of the day. As it was getting dark, Emery and her husband and the kids went to bed. Peete and the Defendant were preparing to go somewhere. Emery's sister, Stacy, was at school, but the rest of her family were in the main house. About an hour or an hour and a half after she went to bed, the Defendant came in, grabbed something, and left. She did not know what the Defendant had in his hand, but described it as "wadded up." She was drifting back to sleep when, about thirty minutes later, she heard banging on the door. She answered the door to her sister Dana Pruett, who was

7

hollering that the victim had been shot and that they needed to do CPR. Emery left the house to attend to the victim. It was about forty-five minutes before the ambulance arrived. Emery stated that she did not see the Defendant again until court.

Emery testified that, on May 6, 2009, the victim had been in a good mood because he had finished a job and had "a good sum of money." He was "bragging happy" about his success. She saw him pull out the money and show it to someone, stating that it was $2,500. The Defendant was present when the victim did this.

On cross-examination, Emery admitted that she had never seen the Defendant wear or carry any bandanas.

William Peete testified that, in May 2009, he was living with the Pruetts in the main house. He had been living there about a year. He had known the victim for a few months. He also knew the Defendant, who was staying in the back house at the time.

On May 7, 2009, Peete got up at about 11:00 a.m. He went to the deck on the back of the main house and saw the Defendant come out of the back house. The Defendant joined him on the deck. The Defendant told him that, earlier, he had been at a neighbor's house with the victim and some other people. The Defendant told him that the victim "was spending money, drinking beer and stuff over there." The Defendant also told him that the victim had been "smoking weed."

At about 3:30 that afternoon, Peete went to his friend Anthony Green's house. They had plans to go to the race track. They went to the Memphis motor sports track, but it was closed due to the weather. They went back to Green's house, where Peete stayed until about 9:00 p.m. They drank some beer and some whiskey, and they smoked a blunt. Peete returned home. Because he did not drink or smoke in the house, he stayed in his car drinking and smoking. He was parked in the driveway. Someone dropped the Defendant off, and the Defendant went to the back house. After ten or fifteen minutes, the Defendant came back out and came over to Peete's car. He got in the car with Peete. Peete stated that the Defendant appeared "high." Peete watched the Defendant "pull[] out a dollar with some cocaine in it" and snort the powder cocaine. He also saw the Defendant smoke some marijuana.

Peete testified that, when the Defendant pulled out the dollar bill, Peete saw the Defendant's gun on the Defendant's waist. He told the Defendant to get the gun out of his car before they went to the store. The Defendant put the gun in a different car. The two men then went to a gas station. On the way, they passed the victim and his friends "standing outside of a house." Once they got to the gas station, Peete went in the store and the

8

Defendant remained in the car. While they were there, the victim pulled up. Peete went over to speak with the victim. He told the victim that he was going to go home and "smoke a few blunts." Peete invited the victim to join him. During this exchange, the Defendant remained in Peete's car. Peete and the Defendant returned to the main house.

On the way, according to Peete, the Defendant said he was going to rob the victim because he, the Defendant, was broke and knew that the victim had money on him. Peete told the Defendant "he can go somewhere else with that" and "don't do that down here, man." When they got home, they sat in the car and Peete rolled a blunt. The Defendant finished his cocaine, sat in the car a few minutes, and then got out of the car. Peete told him to get his gun out of the other car, and the Defendant did so. The Defendant then went to the back house.

In a few minutes, Peete saw the Defendant walking as if he was leaving the neighborhood. By this time, the victim had pulled up. Peete got out of his car with the blunt and walked up to the victim's truck. The truck had a crew cab, and Peete opened the door behind the driver's door, intending to get in. He was standing there with the blunt, asking the victim if he wanted to "hit it." The victim began smoking the blunt and offered Peete some of his beer. The victim asked Peete if he could see the marijuana that Peete had in his car. Peete began returning to his car to retrieve his marijuana. Before he got to his car, he heard the fence rattle and, when he looked around, he saw someone jumping the fence. He could not tell who it was. As the person got closer, Peete recognized the Defendant. Peete testified that the Defendant was wearing a "white T-shirt, some dark colored blue jeans and some black Air Force Ones. He had a bandana on his head, a red bandana on his head and a black one with some kind of bones or skulls or something on there." Peete stepped in front of the Defendant and asked him what he was doing. Peete testified that he told the Defendant, "hell no, man, don't do that over here." Peete stated that the Defendant told him "to get the fuck out of his way." The Defendant raised his gun, which he was holding in his right hand, and pulled the slide back to put a bullet in the chamber. The Defendant pointed the gun at Peete and pushed him out of the way. Fearing that he would be shot, Peete stepped away.

Peete started toward the main house and saw a "flash." Thompson ran up to him. Peete looked toward the truck and saw the victim come out of the passenger side. Peete saw the Defendant come out of the driver's side door, saw the Defendant chase the victim, saw the victim fall, and saw the Defendant "going in [the victim's] pockets." Peete did not see where Parker went. Peete clarified that he could see the Defendant's face as the Defendant was going through the victim's pockets. Peete then saw the Defendant "leave the scene." Peete testified that the Defendant "left and ran toward the railroad track." Peete did not see the Defendant again that night.

9

Subsequently, Peete gave a statement to the police. He testified that his statement to the police was not consistent with his testimony. He testified, "I told them it was a masked man came to the truck and robbed him, pulled a gun on us." Peete explained that he gave this abbreviated version out of fear because he did not know if the Defendant was going to come back. He admitted that he did not tell anyone that he knew that the Defendant was the assailant.

Later, Peete gave a second statement to the police in which he claimed that someone else told him that the Defendant was the perpetrator. He testified that he did this because, at the time, the Defendant was "still out . . . on the run," and he remained frightened of the Defendant. After Peete gave his second statement to the police, the police arrested him and he was charged with the felony murder of the victim. Peete testified that, as of the time he was testifying, his case had not been disposed of. He also stated that he had not received anything for his testimony.

Peete testified that he was arrested and jailed on May 8, 2009, and that the Defendant was not arrested until a week later. Peete remained in jail and saw the Defendant after his arrest. Peete testified that, when he saw the Defendant, he spoke to him as follows:

I looked [at] him and I said – asked what the hell was he doing, you know, what was you thinking. He told me he didn't know nothing about no murder and turned his back, act like he didn't hear nothing. I got upset with him and told him you need to start remembering. You need to tell these folks what happened because I'm not taking the charge. You gone [sic] tell these folks. He told me he didn't know nothing about what I was talking about. He just blowed (sic) me off.

Peete did not see the Defendant again until February 2010 in court. Peete testified that they "g[o]t into a discussion about the case and [Peete] told him he needs to go in there and confess and man up to this charge because [Peete was] not going to take this." Peete testified that the Defendant responded by telling Peete that if Peete "said anything against him, . . . he was going to send his guys at [Peete]."

Peete saw the Defendant again during the trial. Peete testified that the Defendant told him "they waiting on you in the penitentiary." Peete took this to mean that inmates were "going to be out to kill [him] or something."

On cross-examination, Peete admitted to having sold marijuana to the victim in the past. He denied that, while he was in the Shell station prior to the shooting, he told Kevin Peete that he was going to try to rob the victim and that he was looking for a 40-caliber

10

handgun. He stated that, on April 25, at the time the case was initially set for trial, the Defendant told him that he, the Defendant, "was going to take this charge."

Peete denied that he saw Smith on the night of the shooting.

Benjamin Sykes, twenty-three years old at the time of trial, testified that he spent a lot of time with the Pruetts and that he also knew the victim. He also knew the Defendant and stated that they had become friends when Sykes was twelve years old. They spent a lot of time together, including smoking marijuana and snorting powder cocaine. Sykes had received disability payments for ADHD and took medication for it. Three or four weeks before the shooting, Sykes saw the Defendant with a weapon.

On May 7, 2009, Sykes was visiting another friend, smoking marijuana, and drinking beer. He saw police cars nearby and called the Defendant. The Defendant answered and sounded "[l]ike he was trying to catch his breath while he was running." The Defendant told Sykes that he, the Defendant, thought that he had shot someone. Sykes ended the phone call, but the Defendant called him later that night. The Defendant asked Sykes, "did he die or anything?" Sykes responded affirmatively. Sykes later spoke with the police and identified the Defendant from a photographic array.

Sykes acknowledged that he had been convicted of aggravated assault on July 25, 2011. While he was in jail for that offense, he saw the Defendant. The Defendant told him "to call this investigator and make another statement saying that [he, Sykes] was slow and [he's] on medication and that [he] get [sic] a check." The Defendant also told him that he should change his story to the effect that the caller was not the Defendant and that it was hearsay. The Defendant also wrote him a letter telling him how to change his story.

On cross-examination, Sykes denied that Peete had discussed robbing the victim with him. He admitted that Peete had talked to him on May 7 about "hitting a lick" but denied that Peete referred to the victim's name.

Officer Jeremy Todd of the Memphis Police Department ("MPD") testified that he and his partner, Officer Falatko, responded to the scene. Several women were near the victim and stated that the suspect had gone "through the woods." Officer Todd explained that there were some woods near the railroad tracks at the intersection of Floyd and Terrace. Officer Todd went in the indicated direction and found an open wallet next to the railroad tracks. He alerted crime scene officers, who later recovered it.

On cross-examination, Officer Todd stated that he did not examine the contents of the wallet. As it was laying open, he noticed that it contained a driver's license.

11

Officer Brian Falatko of the MPD testified that he responded to the scene with Officer Todd. There, they "observed one male white had been shot and he was laying in the street." He stated that there appeared to be a bullet hole in the victim's chest area.

Officer Demar Wells of the MPD testified that he reported to the scene as part of the scene investigation unit. By the time he got there, the victim already had been removed. Officer Wells first examined the truck, where he found a potato chip bag and a partially full beer bottle on the ground near the passenger side. Inside the vehicle, he found a partially full beer can, a marijuana cigar, and a black cloth purse. He swabbed the beer containers for DNA. On the front passenger side of the truck, near the glove compartment, Officer Wells observed "possible blood." Officer Wells stated that the "possible blood" "appeared to be freshly dried." He also recovered a wallet at the scene containing the victim's driver's license and $66.45 in cash. The wallet was located near the railroad tracks in a wooded area. Finally, Officer Wells collected five latent fingerprints from the scene.

On cross-examination, Officer Wells admitted that he did not find a weapon or any shell casings at the scene.

Officer David Galloway of the MPD testified that he also worked on the crime scene investigation by processing the exterior of the victim's truck for latent fingerprints. He collected seventeen prints for further processing.

Officer Nathan Gathright testified that he was employed by the MPD as a latent prints expert. Of the prints recovered from the victim's truck, he identified none as belonging to the Defendant. He identified one as belonging to Casey Sears.

Special Agent Lawrence James of the Tennessee Bureau of Investigation ("TBI") testified that he is a forensic scientist working in the fields of serology and DNA. He recovered the victim's DNA from the victim's wallet, but he did not obtain anyone else's DNA from the wallet. He also obtained DNA from a "blunt" recovered from the victim's truck and found DNA consistent with both the victim's and Peete's known DNA samples.

Officer Curtis Allen of the MPD testified that he was tasked with bringing in the Defendant. Over the course of two separate days, May 8, 2009, and May 12, 2009, he went to nine locations looking for the Defendant. He did not find the Defendant at any of these locations. He did not know how the Defendant eventually came to be in police custody.

Dr. Lisa Funte, assistant medical examiner at the Shelby County Regional Forensic Center, testified about the autopsy report prepared by her colleague, Dr. Karen Chancellor. Dr. Chancellor performed the autopsy of the victim on May 8, 2009. Dr. Chancellor

recovered a bullet from the victim's back as well as fragments of copper jacketing along the wound tract. The bullet followed a path from front to back, from left to right, and downward. The bullet damaged both of the victim's lungs, his heart, liver, and right kidney. Dr. Chancellor opined that the cause of death was a gunshot wound of the thorax. Dr. Funte agreed with Dr. Chancellor's opinion. The autopsy report also noted two abrasions and a laceration to the victim's face.

On cross-examination, Dr. Funte agreed that the gunshot was fired from "very close range." She stated that the injuries to the victim's face were "blunt force" injuries.

On redirect examination, Dr. Funte testified that it was "very doubtful" that someone could survive the victim's wound and that death probably occurred within a minute.

Pamela Minor testified that she worked in the Criminal Court Clerk's Office, customer service department. She identified a document that came through "jail mail" that purported to be from the Defendant. The document was hand-written. She did not know who wrote it.

Juaquatta Harris testified that she worked for the Shelby County Sheriff's Office. She monitored and disseminated inmate jail phone calls. She explained that she was able to make recordings of inmate phone calls. She identified several CDs that contained recordings of phone calls placed by the Defendant.

Janis Dunavant, Director of Administrative Services for the Shelby County Criminal Court Clerk's Office, testified that her office maintained the records for all criminal cases bound over by the grand jury in Shelby County. She identified a hand-written document styled "Motion to Suppress False Affidavits in Court Case" that had been filed in the Defendant's case. The document did not contain a signature, but the Defendant's name was printed at the end, following the phrase "respectfully submitted."

On cross-examination, Dunavant admitted that she did not know who authored the document. She also admitted that she did not know if the contents of the document were true or false.

Tiffany Benson testified that, in May 2009, she was seventeen years old. At that time, she lived in Memphis with her mother, her sister, and her sister's children. She was dating the Defendant and had been for about four months.

As of May 7, 2009, she did not know the victim, the Pruetts, Smith, Peete, or Sykes. "[L]ater on" during the night of May 7, 2009, the Defendant came by Benson's home after

13

calling her and telling her that he wanted to talk to her. When he arrived thirty minutes to an hour later, he "looked normal, just like his shirt looked like it had been ripped or something." She recalled that he was wearing a white shirt.

As Benson continued taking care of some matters with her mother, the Defendant went to her room. When she joined him about thirty minutes later, the Defendant was talking on the phone, but she did not hear what he said. When she asked him what he wanted to talk about, he said, "We'll talk later," and got in the shower. After he was finished, they both got into bed and watched television. Benson fell asleep. She awoke at about 3:00 a.m. and heard the Defendant talking on the phone. She testified that she "heard crying through the other side of the phone." She did not know the identity of the person crying. She did not remember what the Defendant said while on the phone.

After the Defendant finished the phone call, Benson asked him what was going on. She noticed that the Defendant was watching the news on television. She testified that the Defendant told her "that it was a plan, it supposed to have been a plan," "[t]hat he ran up to a truck and laid everybody down." He told her "that he tried to lay everyone down and the guy wouldn't lay down so he pulled the gun on him." He told her that, after he pulled the gun, it "went off." At that point, the Defendant told her, he "just start running." The Defendant did not tell her who the victim was or where the shooting occurred. Benson described the Defendant's demeanor during this conversation as "scared, frightened, like he really didn't want to tell [her]."

She and the Defendant went back to sleep. When she woke up at 7:00 a.m., the news was still on, and she watched the report of a homicide. The report referred to the location as Terrace and Floyd, a location she was familiar with because she had dropped the Defendant off at that location one day. The Defendant left her house shortly before she did that morning. She did not know where he went. It was a couple of days before she saw the Defendant again, but he called and told her he "was trying to get in contact with his lawyer."

She next saw the Defendant a couple of days later when she came home from work and saw the Defendant sitting outside her house with her brother. Sometime later, she, her mother, and her sister left to attend a party. The Defendant went with them but stayed in the car while they went into the house where the party was being held. She testified that the Defendant was on the phone while he was in the car. On their way home from the party, they dropped the Defendant off at some apartments.

The next day, the Defendant came by. She went to sleep. About thirty minutes later, at about 5:00 or 6:00 that evening, she awoke to the police "beating at the door." She noticed that the Defendant was no longer there. She spoke with the police and told them what she

knew about the shooting. She also identified the Defendant from a photographic array. When she next spoke with the Defendant, before he was arrested, she did not tell him that she had told the police about his involvement in the shooting.

After the Defendant was arrested, she testified at his preliminary hearing on June 17, 2009. She stated that she "was scared that something was going to happen to [her] or [her] family." She clarified that she was scared of "[s]omething to harm [them] or something for [her] knowing and [her] telling the truth." Although she did not want to, she testified against the Defendant. She did not know at that point that she was pregnant. In December 2009, Benson delivered a baby daughter. She testified that the Defendant was the baby's father.

After the preliminary hearing, the Defendant called her and asked her why she had testified against him. She stated that the Defendant continued to call her many times before trial. The State played one of the CDs earlier admitted that contained recordings of phone calls the Defendant made from jail. Benson identified the voices from a phone call recorded on June 17, 2009, as hers and the Defendant's. She stated that she was crying during the call.

Although she had been telling the Defendant to stop calling her, he persisted. He called her cell phone, her work phone, her sister's phone, her mother's phone, and "three-way." She changed her phone number four or five times. He also wrote her over one hundred letters, in spite of her requests that he stop writing her.

On March 26, 2011, Benson received two "three-way" phone calls from the Defendant. The calls were placed through a man named Walter. The Defendant told Benson that Walter was the Defendant's uncle. Benson testified that she last spoke with the Defendant by phone in March 2011 and that she remembered that final phone conversation because the Defendant told her "not to show up for trial." He also told her "[t]o hide and not to sign a subpoena and not to open a door for the police when they come." The prosecution played the recordings of these phone calls for the jury. Benson testified that, at this time, she was living on her own. She became scared because the Defendant was telling her that he would "have somebody to come and get [her] and hide [her]." She moved in May 2011 because she "was scared in [her] own house."

The prosecution played several other phone calls in which Benson identified the Defendant's voice.

Benson testified that on some occasions the Defendant would offer her money and to take care of her if she did not go to court. On another occasion, he threatened to take custody of their daughter.

15

Benson identified numerous letters she received from the Defendant. Although the Defendant told her to destroy the letters, she kept them. According to Benson, in one letter, the Defendant suggested that she say that she had been coerced by the police. In another letter, he explained that Walter was dying of cancer, that the Defendant was going to receive $20,000 when Walter died, and that the Defendant would give her $10,000 if he got out of jail. He told her to refuse to testify. In other letters, he asked her to write what he told her to write in her handwriting. He also told her not to show up to court and to dodge the subpoena. He gave her the name and number of his "investigator" and told her to call the investigator to change her statement. The letters were admitted into evidence.

On cross-examination, Benson admitted that she could not point to any place in the phone calls or letters in which the Defendant asked her to lie for him. Rather, he kept telling her to "tell the truth" and told her that, if she was not going to tell the truth, she should not testify. She also admitted that she did not call the police after the Defendant told her that he thought he had shot someone or after she heard the news report about a fatal shooting. She stated that she did not call the police because she was afraid.

Benson also admitted that, for months and months while the Defendant was communicating with her, she was lying to him. She admitted that, although she became frightened when the Defendant found out where she was living on her own, she waited two months before moving out. She stated that she continued having conversations with the Defendant because he was the father of her child. She explained her continuing course of lying to the Defendant:

Because I was scared. If I told him the truth, I don't know who [sic] going to come to my door or my mom's house and do anything to me or them. So I told him what he wanted to hear like I was on his side, which I wasn't. I never not one time told the police or anybody down here that he didn't do it.

After Benson finished testifying, the Defendant was ordered to show the jury his tattoo. The State then rested its case-in-chief. The defense put on no proof.

After deliberating, the jury convicted the Defendant of first degree felony murder; attempted aggravated robbery; employing a firearm during the commission of a dangerous felony; two counts of bribing a witness; and two counts of coercing a witness. The trial court sentenced the Defendant to life imprisonment for the murder conviction. After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to six years for the attempted aggravated robbery conviction and to six years for the firearm conviction. The trial court merged the two convictions for coercing a witness and sentenced the Defendant to four years for that offense. The trial court sentenced the Defendant to six years for each

16

of the bribery convictions. The trial court then ordered that all of the sentences were to be served consecutively, with the exception of the sentences for the attempted aggravated robbery and firearm convictions, which the trial court ordered to be served concurrently to each other. Therefore, the Defendant received an effective sentence of life plus twenty-two years.

In this direct appeal, the Defendant contends that (1) the evidence is not sufficient to support his conviction of first degree felony murder; (2) the trial court's consolidation of the indictments was reversible error entitling him to a new trial; (3) the prosecution engaged in improper closing argument; (4) cumulative errors entitle him to a new trial; and (5) the trial court erred in ordering consecutive sentences. We will address each of these contentions in turn.

## Analysis

### Sufficiency of the Evidence

The Defendant argues that the proof at trial is not sufficient to support his conviction of first degree felony murder committed in the perpetration of an attempted robbery.[2] The State disagrees.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly,

---

[2] The Defendant does not challenge the sufficiency of the proof of his other convictions.

the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

First Degree Felony Murder

First degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2009). The only culpable mental state required for a conviction of first degree felony murder is "the intent to commit the enumerated offense," here, attempted robbery. Id. § 39-13-202(b). Robbery, in turn, is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a) (2006). Finally,

> [a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a)(3) (2006).

Thus, the State was required to prove that the Defendant intended to rob the victim, took a substantial step toward that end, and, while doing so, killed the victim. We hold that the proof is more than sufficient to support the Defendant's conviction of the felony murder of the victim. Smith testified that, on May 7, 2009, the Defendant told him that he, the Defendant, intended to commit a robbery. Peete testified that the Defendant told him that he, the Defendant, intended to rob the victim. Later, Peete saw the Defendant armed with a pistol in an area near the victim. Peete accosted the Defendant, who told Peete to get out of the Defendant's way. The Defendant raised his gun and chambered a round. The Defendant then pointed his gun at Peete and pushed Peete out of the way. A short time later, Peete saw a "flash" and saw the victim and the Defendant both leave the victim's truck. Peete watched the Defendant follow the victim and then go through the victim's pockets. Peete also watched the Defendant run from the scene toward the nearby railroad tracks. The victim's wallet was recovered from this area. Thompson and Parker both testified that, while they were sitting with the victim in the cab of the pickup, someone ran up, threatened the victim with a gun, demanded money, and then shot the victim. Sykes testified that, after the shooting, the Defendant called him and told Sykes that he, the Defendant, thought he had shot someone. Benson testified that, after the shooting, the Defendant told her that he

18

thought he had shot someone. The proof established that the victim died from a single gunshot wound.

The Defendant argues on appeal that Peete was not credible and that there is no physical evidence directly connecting the Defendant to the victim's murder. However, the jury, as opposed to this Court, resolves issues of credibility. In this case, the jury obviously accredited Peete's testimony. Additionally, Peete's testimony was sufficiently corroborated by other evidence. See State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (recognizing that "[i]t is beyond dispute that in Tennessee a conviction may not be based upon the uncorroborated testimony of an accomplice"). Finally, physical evidence is not necessary to sustain a murder conviction. See, e.g., State v. Tamaine Works, No. W2005-01048-CCA-R3-CD, 2006 WL 1491636, at *12 (Tenn. Crim. App. May 26, 2006) (sustaining a first degree murder conviction and recognizing that physical evidence "is not required to uphold a jury verdict"), perm. app. denied (Tenn. Nov. 6, 2006). Accordingly, we hold that the Defendant is entitled to no relief from his first degree felony murder conviction on this basis.

Employing a Firearm During the Commission of a Dangerous Felony

Although not raised by the Defendant, we hold that the evidence is not sufficient to support the Defendant's conviction of employing a firearm during the commission of a dangerous felony. The relevant statute provides that this offense is committed when the accused employs a firearm during the commission of a "dangerous felony." Tenn. Code Ann. § 39-17-1324(b)(1) (Supp. 2008). As of May 2009, "dangerous felony" was defined to include the following: (1) attempted second degree murder; (2) voluntary manslaughter; (3) carjacking; (4) especially aggravated kidnapping; (5) aggravated kidnapping; (6) especially aggravated burglary; (7) aggravated burglary; (8) especially aggravated stalking; (9) aggravated stalking; (10) "[i]nitiating the process to manufacture methamphetamine"; (11) a "felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance"; and (12) an attempt to commit any of these crimes. Id. § 39-17-1324(i)(1). First degree felony murder and the robbery offenses are not included in this list. Accordingly, the Defendant should not have been convicted of employing a firearm during the commission of a dangerous felony.

Our review of the jury charge reveals that the trial court instructed the jury that, as to the count charging the Defendant with employing a firearm during the commission of a dangerous felony, "the term 'dangerous felony' is limited to Voluntary Manslaughter only." Previously, the trial court had charged the jury on voluntary manslaughter as a lesser-included offense of first degree felony murder. Thus, because the jury convicted the Defendant of first degree felony murder, and not voluntary manslaughter, the Defendant's

19

conviction of employing a firearm during the commission of a dangerous felony cannot stand. Indeed, after dismissing the jury, the trial court addressed the Defendant as follows:

> However, since the employing a firearm during a felony would only apply if you had been found guilty of voluntary manslaughter, had the jury come back with a lesser included offense of voluntary manslaughter it would have applied. But since they did not, employing a firearm does not apply to murder first degree, nor does it apply to criminal attempt aggravated robbery.
>
> In light of that, that case is a nullity. The finding on that is a nullity, and I find as such now as a matter of law.

Nevertheless, the trial court subsequently sentenced the Defendant on this offense and entered a judgment of conviction.

The trial court was correct when it initially informed the Defendant at trial that the jury's verdict of guilty on his charge of employing a firearm during the commission of a dangerous felony was a nullity. The trial court subsequently erred when it sentenced the Defendant and entered a judgment of conviction on this offense. Accordingly, we reverse and vacate this conviction and dismiss the charge with prejudice.

*Consolidation of Indictments*

In early December 2009, the Defendant was indicted for the first degree felony murder of Ben Walker; the attempted aggravated robbery of Ben Walker; and employing a firearm during the commission of a dangerous felony. In August 2011, almost two years later, the Defendant was indicted for two counts of bribing a witness and two counts of coercing a witness, all counts involving Tiffany Benson. In September 2011, the State moved the trial court to consolidate these two indictments, a motion the Defendant resisted. The trial court held a hearing on this motion. At this hearing, Tiffany Benson testified as follows:

In May 2009, after Benson had been dating the Defendant for about four months, the Defendant came to her house at about 9:00 or 10:00 p.m. and told her that he had shot someone. She stated that he was scared and that he told her it was "an accident." He told her that he "tried to rob someone and it went bad and the gun went off" and that he "just ran." When asked to elucidate, she testified,

> He told me that he was trying to rob someone, and he went up to the truck; and the guy that he was trying to rob did not want to get down; so he

20

pulled the gun out on him, and the guy tried to, you know, grab it; and the gun went off, and he shot him.

The Defendant told her that he had shot the victim in the chest. She then saw a news report about the shooting and the report indicated that there were no suspects at the time. The report also indicated that the victim had died.

A couple of days later, the police arrived at Benson's home. The Defendant was not there. Benson told the police what the Defendant had told her. After the Defendant was arrested, she testified at his preliminary hearing.

Benson testified that the Defendant called her many times from jail. He also wrote her many letters. He told her not to come to court. He also told her that, if she did testify, she should testify that "he didn't do it." He told her that if she showed up at court, she would be taken to jail. He also offered her money to not testify against him. The last time she spoke with him by phone several months before trial, the Defendant "was trying to say that he was going to send somebody to my house to take [their] baby away." The Defendant's threats frightened her. A week later, her neighbor reported that the Defendant's brother had come knocking at Benson's door. This also frightened her.

After the hearing, the trial court granted the State's motion to consolidate the indictments, and the Defendant now contends that the trial court committed reversible error in so doing.

We review a trial court's decision to consolidate offenses for an abuse of discretion. See State v. Garrett, 331 S.W.3d 392, 401 (Tenn. 2011). We will conclude that a trial court abused its discretion when it applied incorrect legal standards, reached an illogical conclusion, based its ruling on a clearly erroneous assessment of the evidence, or applied reasoning that causes an injustice to the complaining party. Id. We also will find an abuse of discretion "when the trial court has failed to consider the relevant factors provided by higher courts as guidance for determining an issue." Id. (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).

Our supreme court also instructs us that,

because the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses.

21

Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000).

Tennessee Rules of Criminal Procedure 8, 13, and 14 govern the consolidation and/or severance of multiple offenses for a single trial against a single defendant. Rule 13 provides that a trial court "may order consolidation for trial of two or more indictments . . . if the offenses . . . could have been joined in a single indictment, presentment, or information pursuant to Rule 8." Tenn. R. Crim. P. 13(a). Rule 8, in turn, provides that offenses may be consolidated "if: (1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). Nevertheless, a defendant is entitled *as of right* to the severance of offenses that have been consolidated "unless [1] the offenses are part of a common scheme or plan *and* [2] the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b) (1) (emphasis added). As to the first of these two prerequisites, "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Moore, 6 S.W.3d 235, 240 n.7 (Tenn. 1999).

When a defendant seeks to prevent offenses from being consolidated, "the trial court must look at 'the facts and circumstances involved in the various crimes that are charged.'" State v. Hall, 976 S.W.2d 121, appx 146 (Tenn. 1998) (quoting State v. Morris, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990)). And,

> the "primary issue" to be considered . . . is whether evidence of one offense would be admissible in the trial of the other[s] if the . . . offenses remained severed. In its most basic sense, therefore, any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is "really a question of evidentiary relevance."

Spicer, 12 S.W.3d at 445 (citation omitted) (quoting Moore, 6 S.W.3d at 239). Thus, when a trial court is called upon to decide whether evidence of a defendant's alleged crimes on one occasion may be admitted in conjunction with proving his alleged crimes on another occasion, the provisions of Tennessee Rule of Evidence 404(b) come into play. See Garrett, 331 S.W.3d at 402.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Our supreme court has recognized that

> the rationale behind this general rule of inadmissibility is that the "admission of other wrongs carries with it the inherent risk of the jury convicting a

22

defendant of a crime based upon his or her bad character or propensity to commit a crime, rather than the strength of the proof of guilt on the specific charge."

Garrett, 331 S.W.3d at 402 (quoting State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008)).

When a defendant resists the State's effort to consolidate offenses, it becomes the State's burden to adduce evidence establishing that consolidation is proper. State v. Toliver, 117 S.W.3d 216, 228 (Tenn. 2003) (citing Spicer, 12 S.W.3d at 447). Moreover, the trial court must hold a hearing and, before it orders consolidation, the trial court

must conclude from the evidence and arguments presented at the hearing that: (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Spicer, 12 S.W.3d at 445 (citations omitted). In conjunction with issuing its ruling, the trial court should also issue its findings of fact and conclusions of law. Garrett, 331 S.W.3d at 403.

In this case, the trial court ruled that the State had established a "common scheme or plan." Accordingly, we turn to the first prerequisite necessary for the proper consolidation of the Defendant's alleged crimes against Ben Walker with his alleged crimes against Tiffany Benson: whether the Defendant's felony murder and attempted aggravated robbery of Walker while employing a firearm, and his subsequent attempts to silence through bribery and coercion a witness to the crimes against Walker, were *all* part of a common scheme or plan.

Our supreme court has recognized that there are three types of common schemes or plans: "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." State v. Shirley, 6 S.W.3d 243, 248 (Tenn. 1999) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 404.11, at 180 (3rd ed. 1995)). In this case, the State asserted, and the trial court agreed, that the Defendant's offenses against Walker and his later offenses against Benson were part of a

larger, continuing plan or conspiracy. In support of its position, the State argued at the consolidation hearing as follows:

> [T]he State's position is that [the Defendant's] common scheme or plan here is to avoid prosecution or conviction for the murder of Ben Walker. And the coercion of Ms. Tiffany Benson is part of that common scheme or plan to avoid the prosecution or conviction. [The Defendant] doesn't want to be convicted of murdering Ben Walker.

The trial court ruled that the third type of common scheme or plan also had been established because the Defendant's actions against Benson "directly flowed from the homicide case" and were "part and parcel of the robbery." The trial court described the Defendant's crimes against both Walker and Benson as "a continuing thing." The trial judge explained:

> It is a continuing offense, not unlike leaving the scene of a robbery in a liquor store, . . . high rate of speed, runs over a squad car and kills a police officer. He didn't set out to do that but it was a chain of events and it should be consolidated.
>
> Here we have a chain of events dealing with the same subject matter, a homicide. And we have coercion and bribery directly related to the homicide.

As to offenses alleged to be part of a larger plan, our supreme court has explained that "[a] larger plan or conspiracy in this context contemplates crimes committed in furtherance of a plan that has a readily distinguishable goal." State v. Denton, 149 S.W.3d 1, 15 (Tenn. 2004). That is, "[t]he larger, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." State v. Hallock, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). See also Neil P. Cohen, et al., Tennessee Law of Evidence § 4.04[12][c] (5th ed. 2005) ("The unifying concept of crimes admitted under this theory is not their high degree of similarity but the common goal or purpose toward which each crime is directed."). "In such circumstances, the proof sought is of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial." State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995) (citing N. Cohen, Tennessee Law of Evidence § 404.11 (2nd ed. 1990)), overruled on other grounds by Spicer, 12 S.W.3d at 447 n.12. When the State fails to demonstrate a "working plan" whereby the subsequent offenses are predictable or probable from the defendant's initial offenses, the subsequent offenses cannot be classified as parts of a larger, continuing plan. See Denton, 149 S.W.3d at 15; State v. Allen Prentice Blye, No. E2001-01375-CCA-R3-CD, 2002 WL 31487524, at *6 (Tenn. Crim. App. Nov. 1, 2002), perm. app.

denied (Tenn. Mar. 10, 2003). This Court previously has opined that "the larger, continuing plan category has typically been restricted to cases involving crime sprees, where the defendant commits several crimes quite closely in time to one another." Allen Prentice Blye, 2002 WL 31487524, at *6 (citing Hall, 976 S.W.2d at 146).

After a careful review of the specific facts of this case, we hold that the trial court erred in concluding that the Defendant's crimes against Walker and his later crimes against Benson were all part of a larger, continuing plan. According to the Defendant's statement to Benson, the gun "went off" during a struggle with the victim, indicating that the Defendant did not intend to shoot Walker. The Defendant also told Benson that his intent was to rob the victim, not shoot him. The reasonable inference established at the pretrial hearing was that the Defendant's plan at the time he shot and killed Walker was to steal Walker's money by threatening Walker with a gun. Indeed, the State charged the Defendant with first degree felony murder, not first degree premeditated murder.

Obviously, the Defendant did not want to get caught and prosecuted. He ran from the scene and did not surrender himself immediately to the authorities. He never confessed his crimes to the authorities. Certainly, the vast majority of the criminally accused do not want to get caught and prosecuted for their crimes. Running from the scene and declining to confess, however, do not prove a plan or a goal to later interfere with witnesses.

Also significant is the fact that Benson was not involved in, nor was she a witness to, the shooting itself. Rather, the Defendant himself turned her into a witness by telling her what he had done at a time substantially after committing the original offense. Based on these facts, we cannot conclude that the Defendant's conduct was in furtherance of a pre-existing plan or goal to escape prosecution that included harassing a witness that the Defendant himself created. Moreover, Benson did not testify at the hearing that, simultaneously with telling Benson what he had done, the Defendant threatened or tried to bribe her in order to maintain her silence. Only a significant period of time later, after the Defendant was arrested and realized that Benson spoke with the police days after the shooting, did he begin taking measures to influence her testimony.[3] Thus, these actions were not part of an original plan that included the offenses against Walker.

Our review of relevant case law reinforces our holding that discrete offenses found to be part of a larger plan must each serve or further the overarching goal or plan underlying the initial offenses. See, e.g., Hall, 976 S.W.2d at 146 (consolidation of multiple murders,

---

[3] Indeed, the State alleged in its second indictment that the Defendant committed the bribery and coercion offenses "between May 14, 2009 and March 31, 2011." The murder was committed on May 7, 2009.

burglaries, and thefts committed by escapees of a Kentucky prison was proper because "the various crimes and the sequence of their occurrence were part of a greater plan to leave the country and to avoid capture by the Kentucky authorities"); State v. William Arthur Shelton, No. E2005-02014-CCA-R3-CD, 2006 WL 3246100, at *4-5 (Tenn. Crim. App. Nov. 9, 2006) (consolidation of aggravated kidnapping and vandalism offenses with murder offense proper where defendant detained kidnapping victims in house and vandalized vehicles to prevent their leaving in order to lure murder victim there so he could kill murder victim; defendant announced plans to kill murder victim while detaining kidnapping victims; and defendant continued in his efforts to find and kill the murder victim, succeeding the next morning; establishing "a clear example of a larger, continuing plan"), perm. app. denied (Tenn. Mar. 12, 2007); State v. William Ramsey, No. M2001-02735-CCA-R3-CD, 2003 WL 21658589, at *9 (Tenn. Crim. App. July 15, 2003) (consolidation of aggravated robbery and theft offenses proper, even though four months separated the offenses, where "there was substantial evidence that both the theft and vandalism of the vehicle and the aggravated robbery of Connie Cravens were committed for the same purpose of retaliating against Roy Cravens"), perm. app. denied (Tenn. Dec. 22, 2003).

In the instant case, the Defendant did not know at the time he committed the offenses against Walker that witness tampering later would be "necessary." Moreover, an accused's goal or plan to obtain money through criminal force does not necessarily include the goal or plan to silence a witness that did not even exist at the time the initial offense was committed. See United States v. Carnes, 309 F.3d 950, 958 (6th Cir. 2002) (trial court erred in denying severance of witness tampering charge from firearm and ammunition charges because the defendant wiretapped the witness' phone "prior to knowing he was going to be charged as a felon-in-possession, so the wiretap cannot be considered part of a common plan to intimidate a witness not to testify with respect to that charge").

In short, we hold that the State failed to prove that the offenses against Walker and the offenses against Benson were all part of a larger plan. There was no common goal shared by the two sets of offenses. The goal in the offenses against Walker was money. The goal in the offenses against Benson was to avoid conviction. Thus, the trial court erred in concluding that the two sets of offenses were part of a common scheme or plan on this basis.[4]

_____

[4] We acknowledge that a panel of this Court came to a different conclusion in State v. Larry D. LaForce, II, No. E2007-00334-CCA-R3-CD, 2008 WL 538969, at *7 (Tenn. Crim. App. Feb. 27, 2008). We, however, note that the defendant in LaForce threatened a witness to the crime itself. It may be reasonable to conclude that a defendant has planned to quiet a witness to the actual crime at the time he decides to commit it. Indeed, in the instant case, the Defendant sought to eliminate witnesses to his crimes against Walker by covering portions of his face. We conclude that LaForce is distinguishable from the instant case.

The trial court also found that the Defendant's offenses against Walker and his offenses against Benson were part of a common scheme or plan because they were part of the same transaction. We disagree. As this Court has explained, "[t]he same transaction category involves crimes which occur within a single criminal episode." Hallock, 875 S.W.2d at 290 (citing N. Cohen, Tennessee Law of Evidence at § 404.11 (2nd ed. 1990)); see also N. Cohen et al., Tennessee Law of Evidence § 4.04[13] (5th ed. 2005) ("[C]rimes admitted as part of the 'same transaction' should be limited to those so inextricably connected in time, place, or manner that the jury would be unable to comprehend the essential nature of the charged crime without hearing evidence of the 'other' crime."). Thus, the trial court properly recognized that an offense committed while a defendant is fleeing a crime scene may satisfy the "same transaction" criterion for a common scheme or plan. That, however, is not what occurred in this case. Again, the crimes against Benson were committed long after the Defendant fled the scene of his crimes against Walker. We hold that the trial court erred in concluding that the Defendant's crimes against Walker and his crimes against Benson were part of the same transaction.

In sum, the State failed to establish that the Defendant's actions against Benson were part of his plan to obtain money from Walker by criminal force. The State also failed to establish that the Defendant's crimes against Walker and his later crimes against Benson were part of a single criminal episode. Accordingly, the State failed to satisfy the first prerequisite for consolidation of offenses over the Defendant's objection, and the trial court thereby erred in ordering consolidation.

Our analysis, however, does not end here. This Court reviews a trial court's erroneous consolidation of offenses for harmless error as to each of the defendant's ensuing convictions. See Garrett, 331 S.W.3d at 405.

> That is, we must determine whether the trial court's error more probably than not affected the judgment. In making this determination, we consider the whole record and focus on the impact the error may reasonably be taken to have had on the jury's decision-making. Where an error more probably than not had a substantial and injurious impact on the jury's decision-making, it is not harmless.

Id. (internal quotation marks and citations omitted).

Initially, we consider the primary effect of the erroneous consolidation: Benson's testimony about the Defendant's many efforts to keep her from testifying, both through threats and through promises of benefits. Benson's testimony about the Defendant's "other crimes, wrongs, or acts" that were subsequent to his crimes against Walker was proof subject

27

to Tennessee Rule of Evidence 404(b). As set forth above, such proof is generally inadmissible. It, however, may be admissible when offered to prove "an issue other than the accused's character – issues such as identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake[.]" Tenn. R. Evid. 404, Advisory Comm'n Cmts.

In conjunction with its ruling on the consolidation issue, the trial court ruled that Benson's testimony was admissible under Rule 404(b) because it was relevant to prove the Defendant's "guilty knowledge" about the crimes against Walker. See State v. Berry, 141 S.W.3d 549, appx 582 (Tenn. 2004). This Court has recognized the propriety of admitting in a murder prosecution proof about the accused's conspiracy to kill the State's witnesses as probative of the accused's identity and consciousness of guilt. See State v. Perry Avram March, M2007-00053-CCA-R3-CD, 2011 WL 332327, at *32 (Tenn. Crim. App. Jan. 27, 2011), perm. app. denied (Tenn. July 14, 2011).

Even if offered as something other than propensity evidence, however, Benson's testimony was admissible only if "its probative value [was not] outweighed by the danger of unfair prejudice." Tenn. R. Evid. 404(b). We agree with the trial court that the probative value of Benson's testimony was not outweighed by the danger of unfair prejudice as to the Defendant's crimes against Walker. We reiterate:

> "[a]ny evidence which tends to establish the guilt of an accused is highly prejudicial to the accused, but this does not mean that the evidence is inadmissible as a matter of law." State v. Dulsworth, 781 S.W.2d 277, 287 (Tenn. Crim. App. 1989). Rather, to be inadmissible, the evidence must be *unfairly* prejudicial. "[T]he mere fact that evidence is particularly damaging does not make it unfairly prejudicial." State v. Gentry, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993). Rather, evidence which is unfairly prejudicial is that which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. See State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). Thus, this Court has determined that evidence should not be admitted when its primary purpose "is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998).

Perry Avram March, 2011 WL 332327, at *33. Given that the Defendant's identity as the perpetrator of the crimes against Walker was a significant issue, we conclude that the primary purpose served by Benson's testimony as to the Defendant's crimes against Walker was to establish the Defendant's identity as the assailant, not to elicit improper emotions or a decision on an improper basis. Accordingly, we hold that Benson's testimony was not unfairly prejudicial.

28

In addition to Benson's testimony, the State also adduced recordings of the Defendant's phone calls to Benson, letters he wrote to her, and a pleading that he purportedly filed with the court, adduced to establish his handwriting. While this proof was certainly cumulative insofar as establishing the Defendant's guilty knowledge of his crimes against Walker, we conclude that its admission, even if erroneous, does not appear to have affirmatively affected the jury's verdict to the Defendant's detriment. The proof of the Defendant's crimes against Walker, including his stated intentions to commit the robbery, his witnessed possession of a handgun, the multiple eyewitness testimony to the events of the shooting itself, and the Defendant's subsequent statements to others, was overwhelming. Accordingly, we hold that the trial court's erroneous consolidation of the indictments was harmless error as to the Defendant's convictions of his crimes against Walker.

We now consider whether the erroneous consolidation of offenses was harmless as to the Defendant's convictions of his offenses against Benson. Certainly, proof of the Defendant's having been charged with the crimes against Walker was relevant to establish his motive to coerce and/or bribe Benson to keep her from testifying against him. Proof of motive is admissible pursuant to Rule 404(b) provided that the proof is not unfairly prejudicial. See State v. Moss, 13 S.W.3d 374, 382-84 (Tenn. Crim. App. 1999). However, proof of the Defendant's actual commission of the crimes against Walker (other than his confession to Benson), while perhaps marginally relevant to the witness tampering offenses, was unfairly prejudicial. There is simply too great a likelihood that the jury was swayed to convict the Defendant of every possible offense upon hearing proof of the Defendant's cold-blooded shooting of Walker, including his callous search of his dying victim for his wallet. See Old Chief v. United States, 519 U.S. 172, 181 (1997) (recognizing that the admission of proof about a defendant's other bad acts creates a risk that a jury, even if uncertain of guilt, "'will convict anyway because a bad person deserves punishment'") (quoting United States v. Moccia, 681 F.2d 61, 63 (1st Cir. 1982)). Indeed, although the trial court specifically instructed the jury that it could convict the Defendant of employing a firearm during the commission of a dangerous felony only if it convicted the Defendant of the lesser-included offense of voluntary manslaughter on the felony murder count, the jury nevertheless convicted the Defendant of the firearm offense after convicting him of felony murder. Therefore, because the evidence of the Defendant's crimes against Walker went far beyond that necessary to establish the Defendant's motive to silence Benson and included horrific details of Walker's murder, resulting in unfair prejudice, we hold that the trial court's erroneous consolidation of the indictments affirmatively appears to have affected the verdict of the jury as to the bribery and coercion offenses.[5] Accordingly, we are constrained to

_____

[5] As our supreme court has pointed out in conjunction with reversing a defendant's convictions because of the erroneous consolidation of offenses, "'lenience in the enforcement of such an established rule of procedure [as has been set forth regarding the consolidation of offenses] would

29

reverse the Defendant's convictions of two counts of bribing a witness and two counts of coercing a witness and remand those counts for further proceedings.[6]  See Garrett, 331 S.W.3d at 407.

*Prosecutorial Misconduct*

The Defendant contends that the State engaged in prosecutorial misconduct entitling him to a new trial based on the following portion of the State's closing argument:

> Bill Peete heard the desperation in Ben Walker's voice as Ben Walker fought for his life on May 7th, 2009.  And I submit it compares nothing, nothing to the desperation, if any, that you hear in the [D]efendant's voice on those jail phone calls.
>
> *But the [D]efendant is desperate and wanting the truth and he'll get the truth*, ladies and gentlemen, in this court from you. *Ben Walker wanted to live, wanted to see his parents, have a chance to raise a child.  He didn't get his wish.*[7]

The Defendant asserts that, by making this argument, the State "went outside the proof of a homicide to improperly discuss the wants of the victim for the sole purpose of obtaining an emotional response" and was "presenting a thinly veiled appeal to vengeance emotion."

Although trial courts possess substantial discretion in determining the propriety of closing arguments, they must restrict improper argument. State v. Hill, 333 S.W.3d 106, 130-31 (Tenn. Crim. App. 2010) (citing Sparks v. State, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)).  In making their closing arguments, both parties must be temperate and must predicate their arguments on evidence adduced at the trial.  State v. Sutton, 562 S.W.2d 820,

---

not encourage future compliance with that rule.'"  Garrett, 331 S.W.3d at 407 n.11 (quoting Dotson, 254 S.W.3d at 390).

[6] We note that, if the prosecution proceeds to trial and again adduces proof of multiple instances of witness bribery and coercion, it must elect which offenses to submit to the jury.  See State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001) ("This Court has long and consistently held that 'when the evidence indicates [that] the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought.'") (quoting State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999)).

[7] We have italicized that portion of the closing argument about which the Defendant complains in his brief.  We have included the non-italicized portion for context.

823 (Tenn. 1978). Additionally, summations "must be pertinent to the issues being tried." Id. (internal quotation marks omitted). Prosecutors, particularly, must proceed with caution due to their special role in the criminal justice system. See Hill, 333 S.W.3d at 131 (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). "The State must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." Id. (citing Dupree v. State, 410 S.W.2d 890, 891-92 (Tenn. 1967); Moore v. State, 17 S.W.2d 30, 35 (Tenn. 1929); Watkins v. State, 203 S.W. 344, 346 (Tenn. 1918); McCracken v. State, 489 S.W.2d 48, 50 (Tenn. Crim. App. 1972)).

Even if the record demonstrates prosecutorial misconduct during closing arguments, this Court will not grant a new trial on that basis unless it is "so inflammatory or improper as to affect the verdict." Id. (citing Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)). In determining whether the State's argument improperly prejudiced the defendant and affected the verdict to the defendant's detriment, this Court considers the following factors:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case[;]

2. The curative measures undertaken by the court and the prosecution[;]

3. The intent of the prosecutor in making the improper statement[;]

4. The cumulative effect of the improper conduct and any other errors in the record[; and]

5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Scarborough, 300 S.W.3d 717, 731 (Tenn. Crim. App. 2009).

Initially, we note that the defense lodged no contemporaneous objections to the prosecution's closing argument. As our supreme court recently has emphasized, "it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument. A contemporaneous objection provides the trial court with an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary." State v. Jordan, 325 S.W.3d 1, 57-58 (Tenn. 2010). The failure to lodge a contemporaneous objection results in a waiver of the issue on appeal. Id. at 58; see also State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). We conclude that the Defendant has waived this issue.

Moreover, the Defendant does not argue that he is entitled to plain error relief on the basis of this alleged error.  See  State v. Adkisson, 899 S.W.2d 626, 636-42 (Tenn. Crim. App. 1994) (recognizing that, when an issue is otherwise waived, relief may nevertheless be granted on a determination that plain error was committed).  Therefore, we hold that the Defendant is not entitled to relief on this basis.

## *Cumulative Error*

The Defendant asserts that the cumulative errors committed during his trial entitle him to a new trial on all charges.  As set forth above, we have found errors in conjunction with the sufficiency of the evidence and the consolidation of offenses.  We have addressed those errors specifically and granted appropriate relief.  We have not found error arising from the other issues identified by the Defendant.  Accordingly, we hold that the Defendant is not entitled to relief on the basis of cumulative error.

## *Sentencing*

As set forth above, after the jury returned its verdict, the trial court sentenced the Defendant to life imprisonment for his conviction of first degree felony murder.  After a sentencing hearing, the trial court sentenced the Defendant as a Range I offender to six years for his conviction of attempted aggravated robbery; six years for his employing a firearm during the commission of a dangerous felony conviction; six years for each of the Defendant's two convictions for bribing a witness; and four years on the merged conviction of coercing a witness.  The trial court ordered all of the sentences to be served in the Tennessee Department of Correction.  The trial court also ordered all of the sentences to be served consecutively, with the exception of the sentences for the attempted aggravated robbery and firearm offenses, which the trial court ordered to be served concurrently with each other, but consecutively to the remaining offenses.

The Defendant contends that the trial court erred in ordering him to serve his sentences consecutively.  Specifically, the Defendant argues that the trial court erred in concluding that he is "a professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood" and that he is "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."  Tenn. Code Ann. § 40-35-115(b)(1), (4) (2006).

As set forth above, we have reversed the Defendant's conviction for employing a firearm during the commission of a dangerous felony, and that judgment of conviction must be vacated and the charge dismissed.  We also have reversed the Defendant's convictions for

bribing a witness and coercing a witness and remanded those charges for further proceedings. In light of these significant alterations to the Defendant's convictions, we conclude that a remand for a new sentencing hearing is necessary. See, e.g., State v. Kenneth Lee Herring, No. M199900776CCAR3CD, 2000 WL 1208311, at *9 (Tenn. Crim. App. Aug. 24, 2000), perm. app. denied (Tenn. Feb. 20, 2001). Accordingly, we decline to address the Defendant's contention that the trial court erred in imposing partial consecutive service.

## Conclusion

We affirm the Defendant's convictions of first degree felony murder and attempted aggravated robbery. We reverse and vacate the Defendant's conviction of employing a firearm during the commission of a dangerous felony and dismiss that charge. Due to the trial court's erroneous consolidation of offenses, we reverse the Defendant's convictions of two counts of bribing a witness and two counts of coercing a witness and remand those charges for further proceedings. This matter is remanded for a new sentencing hearing.

_____
JEFFREY S. BIVINS, JUDGE